UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x
KEYANNA MOODY

                                                                    COMPLAINT

                                        Plaintiff,                  JURY DEMAND

            -against-


THE CITY OF NEW YORK, DANIEL LACALAMITA, as
Lieutenant, 60th Precinct, STANISLAV ZUBYK, as Sergeant,
60th Precinct, MICHAEL R. MORAN, as Police Officer, 60th
Precinct, ALVIN M. NIEVES, as Police Officer, 60th Precinct,
JARED W. CORDERO, as Police Officer, 60th Precinct, and
Police Officers JOHN DOES 1 – 5, each sued individually
and in their official capacities as employees of Defendant THE
CITY OF NEW YORK

                                        Defendants
----------------------------------------------------------------------------x

The Plaintiff KEYANNA MOODY through her attorney The Sanders Firm, P.C., files this
federal complaint against Defendants THE CITY OF NEW YORK, DANIEL LACALAMITA,
STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO,
and JOHN DOES 1 – 5, respectfully set forth and allege that:

**<u>INTRODUCTION</u>**

This federal civil rights action arises from a June 11, 2024, incident at approximately
9:05 P.M. in Kings County, during which Plaintiff KEYANNA MOODY, a Black woman and
lawful e-bike operator, was violently assaulted, unlawfully arrested, subjected to racial abuse,
and denied medical care by members of the New York City Police Department. Plaintiff Moody
was operating a Z6 model Fly e-bike near Surf Avenue and West 15th Street in Coney Island
when she and her husband were suddenly surrounded by multiple NYPD officers operating an

unmarked vehicle and a police scooter. The officers aggressively approached without cause and falsely accused her of operating a moped without a license plate—even though, under New York law, her e-bike did not require registration or licensing.

Within moments, NYPD personnel—Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO AND JOHN DOES 1 – 5—escalated the situation without justification. Defendant NIEVES immediately snatched the Plaintiff's e-bike keys from the ignition while officers surrounded her and her husband. Although the Plaintiff complied with officer commands, including sitting on a nearby bench to avoid conflict, she was nonetheless threatened with arrest. When she calmly explained that she did not possess documentation she was not legally required to carry, Defendant LACALAMITA ordered her arrest.

Defendants MORAN and CORDERO tackled the Plaintiff to the ground without warning. Defendant NIEVES attempted multiple times to deploy his taser against her before joining the other officers in physically restraining her. As the Plaintiff lay prone on the pavement, Defendant NIEVES drove his knee and hands into her back while Defendant MORAN stepped on her lower back and legs, treating her as a stepping mat. Despite the presence of at least five officers, no one intervened to stop the brutal assault.

The violence continued as Defendant MORAN shoved and pushed the Plaintiff—now handcuffed—toward a police vehicle. Defendant LACALAMITA began berating her, calling her a "black bitch" before attempting to slap and kick her. He grabbed her by the head and neck and violently pulled her downward toward the vehicle. The Plaintiff was then thrown face-first into the backseat of the patrol car, despite clear NYPD policies prohibiting the prone positioning of handcuffed arrestees due to the risk of positional asphyxia. Her foot became trapped in the door

2

frame during the assault; she screamed in pain, yelling that her foot was caught, but officers ignored her until eventually opening the door to release her.

As she remained handcuffed, Defendant LACALAMITA ordered his subordinates to "put that bitch in a cage," leading to her transfer into another vehicle equipped with a prisoner partition. Plaintiff was transported to the 60th Precinct, where the abuse escalated. There, while still handcuffed, Defendant LACALAMITA kicked her to the floor and stood over her, yelling "get the fuck up." The desk officer on duty failed to intervene.

Despite the presence of a female officer, male officers conducted a full-body search, inappropriately touching her breasts, vaginal area, buttocks, thighs, and other parts of Plaintiff's body. Her questions about why she was being detained were ignored. Despite bleeding knees, torn clothing, and a dirt-covered body, Plaintiff was denied immediate medical care and locked in a holding cell for over five hours. Defendants CORDERO and NIEVES ignored her repeated pleas for help until she refused to provide her fingerprints, prompting paramedics to finally be called.

Even then, as Plaintiff was escorted out for medical treatment, Defendant LACALAMITA stood nearby, menacingly pacing and glaring at her, prompting the Plaintiff to say she did not feel safe around him. At South Shore Brooklyn Hospital, EMTs assessed her visible injuries. While she waited in the resuscitation area, Defendant LACALAMITA approached her from behind and lied to her face, claiming "I'm not him. I wasn't there," before quickly fleeing when confronted.

The doctor on duty, Spencer Doblin Kim, refused to provide Plaintiff with her discharge papers, failed to properly examine her, and ultimately handed the discharge documents to a police officer rather than to Plaintiff herself. She was then transported back to the 60th Precinct

3

and held overnight before being sent to Central Booking, where she learned the charges against her were vague, ultimately dismissed, and never pursued by the District Attorney. Her e-bike, jewelry, phone, keys, and other personal property were unlawfully seized and withheld from her even after she obtained a District Attorney–issued property release form. When Plaintiff presented the form at the 60th Precinct, officers refused to honor it and instead threatened her with arrest if she did not leave.

This incident is not an aberration—it is a manifestation of entrenched racial and gender-based misconduct within the NYPD. Plaintiff alleges that her race and gender were motivating factors behind the baseless stop, the excessive force, and the degrading treatment she endured at the hands of officers who acted with impunity. Her injuries include excruciating back pain, radiating leg pain, numbness, tingling in her arms, and reinjury to a surgically repaired shoulder, as well as lasting psychological trauma.

This incident is not isolated. It reflects a broader pattern of racially motivated and unconstitutional policing long entrenched within the NYPD. Plaintiff alleges that race was a motivating factor in the initial stop, the escalation of force, and the City's systemic failure to discipline or remove abusive officers—claims substantiated by both direct and circumstantial evidence under the framework articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). These include deviations from department policy on e-bike enforcement**,** clear violations of NYPD use-of-force protocols regarding prone positioning**,** a documented pattern of racialized stops and arrests, and a history of uncorrected misconduct by the involved officers, which the NYPD failed to address despite repeated notice through internal complaints, CCRB findings, civil lawsuits, and disciplinary referrals**.** These

facts support a plausible inference of discriminatory intent, institutional ratification, and deliberate indifference on the part of the City of New York and senior NYPD leadership.

These facts, coupled with NYPD statistical data and the Floyd Monitor's 23rd Report, establish a systemic pattern of constitutional violations. In Q4 2024, Black residents accounted for 29.8% of NYPD vehicle stops, despite comprising only 22.7% of the city's population. Supervisors approved 99.1% of stop reports as "lawful," even when independent reviews found widespread misconduct. Several of the involved officers have documented histories of excessive force, racial slurs, and unlawful searches—none of which led to meaningful discipline.

Plaintiff brings this action under the First, Fourth, and Fourteenth Amendments— including due process violations arising from the denial of medical care as a pretrial detainee— 42 U.S.C. § 1983, and the New York City Human Rights Law (Administrative Code § 8-107), asserting claims for unlawful seizure, excessive force, racial profiling, malicious prosecution, denial of medical care, failure to intervene, and municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). These violations reflect not only the individual malice of the officers involved but the City's deliberate indifference to a culture of abuse within the NYPD.

Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, and full accountability for the NYPD's institutional and supervisory role in perpetuating racially biased, gender-based, and unconstitutional policing practices.

## JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1367 and 2201–2202 to secure protection of and to redress deprivation of rights secured by:

    a.     the Civil Rights Act of 1871, 42 U.S.C. § 1983

       b.      New York City Administrative Code § 8-107(17)

2.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), because one or more Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. Specifically, the unlawful stop, assault, arrest, denial of medical care, and related constitutional violations took place in Kings County, within the Eastern District of New York. Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO and JOHN DOES 1 – 5, were all assigned to the NYPD's 60th Precinct in Brooklyn at the time of the incident. The City of New York is also headquartered within this District for purposes of municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Accordingly, venue is proper in this Court.

## PROCEDURAL REQUIREMENTS

3.      Plaintiff KEYANNA MOODY have filed suit with this Court within the applicable statute of limitations period.

4.      Plaintiff KEYANNA MOODY are not required to exhaust any administrative procedures prior to suit under the Civil Rights Act of 1871.

5.      On or about February 22, 2025, Plaintiff KEYANNA MOODY filed a duly verified Amended Notice of Claim with the Office of the Comptroller of the City of New York. The Notice of Claim was filed within ninety (90) days of the incident that occurred on August 6, 2024, in accordance with the requirements of New York General Municipal Law § 50-e. It set forth Plaintiff's claims against the City of New York and members of the New York City Police Department, including violations of the New York City Human Rights Law (Administrative

Code § 8-107)**.** More than thirty (30) days have elapsed since the filing of the Notice of Claim, and the City of New York has neither settled nor adjusted the claim.

**PLAINTIFF**

6.      Plaintiff KEYANNA MOODY is a resident of Kings County.

**DEFENDANTS**

7.      Defendant THE CITY OF NEW YORK is a municipal corporation organized and existing under the laws of the State of New York. At all relevant times, THE CITY OF NEW YORK, through its agency the New York City Police Department ("NYPD"), was responsible for the formulation, implementation, and enforcement of policies, practices, procedures, and customs used by its police officers, including the individual Defendants named herein. THE CITY OF NEW YORK is liable for the acts and omissions of its employees committed within the scope of their employment pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and the New York City Human Rights Law, Administrative Code § 8-107.

8.      Defendant DANIEL LACALAMITA was at all relevant times a Lieutenant Special Assignment in the New York City Police Department, assigned to the 60th Precinct in Kings County. He is sued individually and in his official capacity. As the highest-ranking supervisory officer present during the events of June 11, 2024, Defendant LACALAMITA had the authority and legal obligation to supervise subordinate officers, prevent unlawful conduct, ensure compliance with departmental policy, and protect individuals from constitutional harm. This included responsibilities under NYPD Patrol Guide provisions governing use of force, arrestee treatment, custodial medical care, and anti-discrimination protocols. At the time of the incident, Defendant LACALAMITA exercised direct supervisory authority over Defendants STANISLAV ZUBYK, MICHAEL R.

MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5, all of whom were present on scene and under his command.

9.      Rather than fulfill these obligations, Defendant LACALAMITA personally escalated the encounter by ordering the unlawful arrest of Plaintiff KEYANNA MOODY without probable cause, despite her compliance and the absence of any criminal conduct. He then actively participated in the use of excessive force, grabbing Plaintiff by the head and neck, calling her a "black bitch," and violently pulling her toward a patrol vehicle. He further directed subordinates to "put that bitch in a cage," resulting in her prolonged and degrading confinement. At the 60th Precinct, Defendant LACALAMITA kicked Plaintiff while she was handcuffed and lying on the floor, yelling "get the fuck up" in the presence of other officers. He continued to menace and intimidate Plaintiff during her hospital transfer and later attempted to conceal his identity by falsely denying his involvement.

10.      In his supervisory role, Defendant LACALAMITA also failed to intervene or curtail the unconstitutional conduct of his subordinates, including JOHN DOES 1–5, who either actively participated in or stood by during Plaintiff's assault, unlawful search, and denial of medical care. Despite witnessing or knowing of these acts, Defendant LACALAMITA failed to discipline, report, or take corrective action against these officers. His deliberate inaction, combined with his personal participation and authority over all officers on scene, renders him liable for violations of Plaintiff's rights under the Fourth and Fourteenth Amendments, including unlawful seizure, excessive force, denial of medical care, failure to intervene, and equal protection violations. These acts and omissions support claims for individual, supervisory, and municipal liability under 42 U.S.C. § 1983 and the New York City Human Rights Law (Administrative Code § 8-107).

8

11.     Defendant STANISLAV ZUBYK was at all relevant times a Sergeant in the New York City Police Department, assigned to the 60th Precinct in Kings County. He is sued individually and in his official capacity. As a supervisory officer present at the scene on June 11, 2024, Defendant ZUBYK had the duty, authority, and operational control to supervise subordinate officers, ensure compliance with NYPD policies, intervene to prevent unconstitutional conduct, and de-escalate encounters involving use of force or custodial arrest. At the time of the incident, Defendant ZUBYK exercised supervisory authority over Defendants MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and additional officers identified herein as JOHN DOES 1–5.

12.     Despite personally witnessing the unprovoked assault, racial abuse, and unlawful arrest of Plaintiff KEYANNA MOODY—including Defendant LACALAMITA's order to arrest Plaintiff without probable cause, the violent takedown by MORAN and CORDERO, multiple failed taser deployments by NIEVES, and the public use of racial epithets—Defendant ZUBYK failed to intervene, prevent, or report the misconduct. He permitted the excessive force to continue, took no action as Plaintiff was slammed face-first into a patrol car while handcuffed, and remained silent as Plaintiff was subjected to sexually invasive and inappropriate searches at the precinct by male officers. He further failed to secure medical assistance or ensure that Plaintiff's constitutional rights were protected while she remained in custody.

13.     Defendant ZUBYK also failed in his supervisory capacity by permitting JOHN DOES 1–5—additional NYPD officers under his direct command—to observe and/or participate in these constitutional violations without intervention or accountability. These officers failed to stop the use of excessive force, allowed Plaintiff to be verbally and physically abused while handcuffed, and took no steps to report or document the misconduct. Defendant ZUBYK's

inaction in the face of clear constitutional violations by both named and unidentified subordinate officers constitutes deliberate indifference and personal participation in unlawful seizure, excessive force, denial of medical care, and failure to intervene. These acts and omissions support claims of individual, supervisory, and municipal liability under 42 U.S.C. § 1983 and the New York City Human Rights Law.

14.     Defendant MICHAEL R. MORAN was at all relevant times a Police Officer in the New York City Police Department, assigned to the 60th Precinct in Kings County. He is sued individually and in his official capacity. On June 11, 2024, Defendant MORAN was one of several uniformed NYPD officers who responded to the scene near Surf Avenue and West 15th Street in Coney Island. Acting under the command of Defendant DANIEL LACALAMITA and alongside Defendants STANISLAV ZUBYK, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5, Defendant MORAN was a principal participant in the unlawful arrest, excessive force, and abusive treatment inflicted upon Plaintiff KEYANNA MOODY.

15.     Without warning or legal justification, Defendant MORAN violently tackled Plaintiff to the ground, despite her non-resistance and full compliance with police instructions. As Plaintiff lay prone on the pavement, handcuffed and defenseless, Defendant MORAN stepped on her lower back and legs, using her body as a "stepping mat" in the presence of fellow officers. He then shoved and dragged Plaintiff toward a police vehicle and stood by as Defendant LACALAMITA grabbed her by the head and neck, used a racial slur, and forcefully threw her into the backseat. Defendant MORAN made no attempt to intervene or de-escalate the situation, despite his legal obligation to do so under NYPD policy and federal law.

16.     Following the assault, Defendant MORAN continued to engage in unconstitutional conduct by refusing to provide medical care, assisting in the transport of

Plaintiff while visibly injured, and failing to secure her safety or dignity during her time in custody. He did not object to or report the unlawful force used by himself or other officers, nor did he take any steps to document the incident accurately or prevent further harm. At no point did Defendant MORAN attempt to stop the racial abuse, the retaliatory language used by Defendant LACALAMITA, or the humiliating and invasive search later conducted at the precinct.

17.    Defendant MORAN's actions constitute direct participation in the deprivation of Plaintiff's constitutional rights, including unlawful seizure, excessive force, denial of medical care, and failure to intervene. His conduct further supports municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978), and claims under the New York City Human Rights Law (Administrative Code § 8-107) for discriminatory and abusive policing practices. Plaintiff asserts liability against Defendant MORAN in both his individual and official capacities pursuant to 42 U.S.C. § 1983.

18.    Defendant ALVIN M. NIEVES was at all relevant times a Police Officer in the New York City Police Department, assigned to the 60th Precinct in Kings County. He is sued individually and in his official capacity. On June 11, 2024, Defendant NIEVES was one of the NYPD officers who surrounded Plaintiff KEYANNA MOODY at Surf Avenue and West 15th Street in Coney Island. Acting under the supervision of Defendant DANIEL LACALAMITA and alongside Defendants STANISLAV ZUBYK, MICHAEL R. MORAN, JARED W. CORDERO, and JOHN DOES 1–5, Defendant NIEVES engaged in conduct that directly contributed to Plaintiff's unlawful arrest and the use of excessive force.

19.    Upon arriving at the scene, Defendant NIEVES immediately and without justification snatched the keys from Plaintiff's legally operated Z6 Fly e-bike and demanded

identification and documentation that she was not required by law to possess. When Plaintiff calmly questioned the officers' conduct and declined to provide documents she was not obligated to carry, Defendant NIEVES escalated the encounter, aggressively surrounding her with other officers. Following the unlawful arrest order issued by Defendant LACALAMITA, Defendant NIEVES attempted multiple times to deploy his taser against Plaintiff, despite her non-resistance and visible compliance. When the taser failed, Defendant NIEVES physically restrained Plaintiff on the ground, using his knee and hands to apply pressure to her back while she lay prone and handcuffed.

20.     Defendant NIEVES also stood by as Defendant MORAN stepped on Plaintiff's legs, and as Defendant LACALAMITA grabbed her by the head and neck and threw her face-first into a patrol car, causing further injury. After Plaintiff's arrest, Defendant NIEVES continued to violate her rights by failing to provide or summon medical care, despite observing bleeding knees, torn clothing, and signs of distress. For over five hours, Defendant NIEVES ignored Plaintiff's repeated pleas for help. Only after Plaintiff refused to submit her fingerprints was medical attention finally requested. At no time did Defendant NIEVES object to or report the unlawful force or racist, abusive language used by fellow officers.

21.     Defendant NIEVES's conduct constitutes direct participation in unlawful seizure, excessive force, and denial of medical care, as well as a failure to intervene in constitutional violations committed by fellow officers. His deliberate indifference, combined with his affirmative acts of force and inaction in the face of abuse, renders him liable in both his individual and official capacities under 42 U.S.C. § 1983. His conduct further supports claims for municipal liability under Monell and for discriminatory and abusive treatment in violation of the New York City Human Rights Law (Administrative Code § 8-107).

22.     Defendant JARED W. CORDERO was at all relevant times a Police Officer in the New York City Police Department, assigned to the 60th Precinct in Kings County. He is sued individually and in his official capacity. On June 11, 2024, Defendant CORDERO was one of several uniformed NYPD officers who surrounded and detained Plaintiff KEYANNA MOODY in Coney Island. Acting under the supervision of Defendant DANIEL LACALAMITA and alongside Defendants STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, and JOHN DOES 1–5, Defendant CORDERO actively participated in Plaintiff's unlawful arrest, use of excessive force, and degrading treatment during and after her detention.

23.     Along with Defendant MORAN, Defendant CORDERO tackled Plaintiff to the ground without warning, despite her lack of resistance. He then assisted in forcibly dragging Plaintiff toward a patrol car while she was handcuffed, causing additional physical and emotional trauma. Defendant CORDERO stood by and took no action as Plaintiff was called a "black bitch," violently grabbed by the head and neck by Defendant LACALAMITA, and thrown face-first into a police vehicle. During her detention at the 60th Precinct, Defendant CORDERO made no attempt to prevent further abuse, including a kick to Plaintiff's body while she was handcuffed on the floor, nor did he intervene when male officers conducted a full-body search inappropriately touching Plaintiff's breasts, vaginal area, and buttocks.

24.     Defendant CORDERO also ignored Plaintiff's repeated pleas for medical assistance, even as she displayed visible injuries and voiced extreme discomfort. It was only after she refused to provide her fingerprints that medical attention was finally requested. Further, Defendant CORDERO was directly involved in the unlawful retention of Plaintiff's personal property, including her e-bike, jewelry, phone, keys, and identification. Despite Plaintiff later

presenting a District Attorney–issued property release form, Defendant CORDERO refused to

return her property and instead threatened her with arrest if she did not leave the precinct.

25.    Defendant CORDERO's conduct constitutes direct participation in the use of

excessive force, unlawful seizure, denial of medical care, and retaliatory treatment, as well as a

failure to intervene in constitutional violations committed by his fellow officers. His acts and

omissions support liability in both his individual and official capacities under 42 U.S.C. § 1983,

and give rise to claims for municipal liability under Monell v. Department of Social Services,

436 U.S. 658 (1978), and for violations of the New York City Human Rights Law

(Administrative Code § 8-107).

26.    Defendants JOHN DOES 1–5 are and were at all relevant times members of the

New York City Police Department, whose names and shield numbers are presently unknown to

Plaintiff. They are sued individually and in their official capacities. Upon information and belief,

JOHN DOES 1–5 was assigned to the 60th Precinct and were present at or otherwise directly

involved in the events of June 11, 2024, during which Plaintiff KEYANNA MOODY was

unlawfully stopped, physically assaulted, racially abused, denied medical care, and subjected to

an unconstitutional arrest. These unidentified officers acted under the supervision of Defendants

DANIEL LACALAMITA and STANISLAV ZUBYK and in concert with Defendants

MICHAEL R. MORAN, ALVIN M. NIEVES, and JARED W. CORDERO.

27.    Defendants JOHN DOES 1–5 either actively participated in, or stood by and

failed to intervene in, the use of excessive force against Plaintiff, including her violent takedown,

her prone positioning while handcuffed, and the abusive language and racial slurs directed at her.

These officers observed Plaintiff's visible injuries, ignored her repeated requests for medical

attention, and failed to prevent or report the inappropriate full-body search conducted by male

officers. At no point did any JOHN DOE Defendant attempt to de-escalate the encounter, stop the misconduct, report the constitutional violations, or assist Plaintiff in securing appropriate treatment or due process. Several of these officers remained silent as Plaintiff was threatened, denied her property, and intimidated even after presenting a valid property release order.

28.    The actions and inactions of Defendants JOHN DOES 1–5 directly contributed to the constitutional violations Plaintiff suffered, including unlawful seizure, excessive force, denial of medical care, retaliatory abuse, failure to intervene, and violations of Plaintiff's rights under the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, and the New York City Human Rights Law (Administrative Code § 8-107). Plaintiff reserves the right to amend this Complaint to name these individuals as soon as their identities are ascertained through discovery.

## BACKGROUND

### Allegations of Police Brutality, Unlawful Arrest, and Psychological Trauma

29.    On June 11, 2024, at approximately 8:15 p.m., Plaintiff and her husband were lawfully riding their e-bikes at Canarsie Pier. Plaintiff operated a Z6 Fly e-bike, while her husband rode a Venom Fly e-bike. During their ride, they met two motorcyclists, and the group decided to travel together to Coney Island.

30.    Plaintiff intended to purchase cotton candy for her five-year-old daughter; the others planned to stop at Nathan's Famous hot dogs. While the motorcyclists took the highway, Plaintiff and her husband remained on the designated bike path.

31.    At approximately 8:40 p.m., the couple arrived at the intersection of Surf Avenue and West 15th Street in Coney Island. After purchasing cotton candy, Plaintiff returned to her e-bike and engaged in brief conversation with her husband and the other riders.

32.    As the group exchanged phone numbers and prepared to leave, Plaintiff observed an unmarked NYPD vehicle stopped at a nearby red light.

33.    Moments later, an NYPD police scooter turned onto West 15th Street heading toward the boardwalk but abruptly made a U-turn, aggressively stopping in front of Plaintiff and cutting off her path of travel.

34.    Multiple officers exited the vehicle with hostility. Without warning or explanation, Defendant ALVIN M. NIEVES (Shield No. 19898) immediately snatched the keys from Plaintiff's e-bike and demanded her license and registration.

35.    When Plaintiff calmly inquired why her keys had been taken, her husband—sensing the tension—urged her to sit down in an effort to de-escalate. Plaintiff complied and sat on the nearby green benches.

36.    Despite Plaintiff's compliance and non-threatening demeanor, the officers continued to escalate the encounter, surrounding the couple and demanding documentation she was not legally required to carry. Defendant DANIEL LACALAMITA (Tax Registry No. 935146) then issued a direct threat: if Plaintiff did not produce the documentation, she would be arrested.

37.    Plaintiff calmly reiterated that she had no such documents because they were not legally required for her e-bike. Without further justification, Defendant LACALAMITA ordered her arrest.

38.    Defendants MICHAEL R. MORAN (Shield No. 20363) and JARED W. CORDERO (Shield No. 6948) then violently tackled Plaintiff to the ground without provocation.

39.    Defendant NIEVES attempted multiple taser deployments, which failed. He then physically joined in the takedown, driving his knee and hands into Plaintiff's back while she lay

16

prone and handcuffed on the pavement. Defendant MORAN stepped on Plaintiff's lower back and legs, using her body as a stepping mat.

40.    At least five additional officers, including supervisors and Defendant JOHN DOES 1–5, stood by and failed to intervene, despite personally witnessing this excessive and unnecessary use of force.

41.    As Plaintiff's husband moved to retrieve a body-worn camera that had fallen during the takedown, Defendant MORAN continued to shout profanity at Plaintiff and aggressively shoved her toward a patrol car.

42.    With her hands cuffed behind her back, Defendants MORAN and CORDERO forcibly dragged her toward the vehicle. During this time, Defendant LACALAMITA berated Plaintiff with racial slurs, calling her a "black bitch" and attempted to slap and kick her. He then grabbed her by the head and neck, violently yanking her downward toward the police vehicle.

43.    Plaintiff was then thrown face-first into the backseat of the patrol car, a practice directly contrary to established NYPD policy concerning prone restraint.

44.    The New York City Police Department has long acknowledged the risk of positional asphyxia—a life-threatening condition in which an arrestee's positioning restricts breathing. In accordance with a 1995 U.S. Department of Justice bulletin, NYPD protocol instructs: "*As soon as the subject is handcuffed, get him off his stomach. Turn him on his side or place him in a seated position.*"

45.    Plaintiff's foot became trapped between the door and the frame as officers forced her into the car. She screamed in pain, repeatedly stating that her foot was caught. Officers ignored her cries for help for several moments before finally opening the door to release her foot.

46.    Defendant LACALAMITA then ordered officers to "put that bitch in a cage," resulting in Plaintiff's transfer to a second patrol vehicle equipped with a prisoner partition.

47.    Despite the presence of multiple NYPD officers, including supervisors, no one intervened to stop the use of excessive force, the racial slurs, or the unlawful arrest. The complete failure of any officer to report or prevent the misconduct reflects a deeply entrenched culture of impunity within the NYPD. This coordinated inaction and collective silence violated Plaintiff's rights under the Fourth and Fourteenth Amendments and New York City Human Rights Law, and it supports claims for individual, supervisory, and municipal liability under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978).

## POST-ARREST ABUSE, MEDICAL NEGLECT, AND CUSTODIAL MISCONDUCT

48.    Upon arrival at the 60th Precinct, Plaintiff remained handcuffed with her hands behind her back as she was brought before a desk officer. Without provocation or warning, Defendant DANIEL LACALAMITA approached Plaintiff from behind and forcefully kicked her to the floor.

49.    While she lay handcuffed and stunned on the precinct floor, Defendant LACALAMITA stood over her and yelled, "Get the fuck up," in full view of multiple officers. The unidentified desk officer failed to intervene or report the assault.

50.    Following this attack, Plaintiff was subjected to an unlawful and invasive search. Despite the presence of a female officer, it was male officers who conducted a full-body search, making inappropriate physical contact with Plaintiff's breasts, vaginal area, buttocks, thighs, and other private areas. Plaintiff's pockets were emptied, yet no female officer intervened or took over the search as required under NYPD policy. Throughout this degrading process, Plaintiff

repeatedly asked what charges were being brought against her, but was entirely ignored. The desk officer again took no action to protect Plaintiff or ensure basic due process.

51.     Plaintiff displayed visible injuries—including bleeding knees, torn clothing, and dirt covering her body—yet she was denied medical evaluation or treatment and escorted directly to a holding cell, in violation of NYPD protocols regarding injured arrestees.

52.     For over five hours, Plaintiff remained in custody without medical attention, despite repeatedly requesting help from Defendants JARED W. CORDERO and ALVIN M. NIEVES, who intentionally ignored her pleas. Only after Plaintiff refused to provide fingerprints was EMS finally called. When paramedics arrived, they assessed her and determined that she required immediate transport to the hospital due to the obvious severity of her injuries.

53.     As she was escorted out of the cell, Defendant LACALAMITA again appeared, menacingly pacing, staring at her, and huffing in an aggressive manner, creating a clear impression that he intended to cause further harm. Plaintiff expressed to Defendants CORDERO and NIEVES that she did not feel safe in his presence. Acknowledging her concern, the Defendants instructed Defendant LACALAMITA to leave the area, and he eventually complied.

54.     Paramedics transported Plaintiff to South Shore Brooklyn Hospital. During the ambulance ride, EMTs conducted an initial evaluation and recorded her visible injuries. Upon arrival, her vitals were taken and she was placed in the resuscitation area for further observation.

55.     While awaiting treatment, Plaintiff was approached once again by Defendant LACALAMITA, who entered the hospital and stood behind her without warning. Startled and alarmed, Plaintiff immediately stated: "What are you doing here? I don't want to talk to you. I don't want you here. I don't feel safe around you." In response, LACALAMITA lied, saying, "I'm not him. I wasn't there," before hastily retreating when confronted.

56.     Plaintiff remained at the hospital for approximately 1.5 to 2 hours before being told she was discharged. When she requested a copy of her discharge papers, the attending physician refused, stating he could not give them to her. Plaintiff asked how she could be discharged without a formal medical examination, explaining that she was still in pain. The doctor dismissed her concerns, responding sarcastically, "Do you want an examination now?" Plaintiff, not feeling safe or respected in the environment, said "No."

57.     Instead of handing the discharge paperwork directly to Plaintiff, the doctor gave it to the female officer escorting her. When Plaintiff asked for the physician's name, he covered his name tag and said, "It's on your discharge papers," before storming off. Plaintiff later identified the physician through her MyChart medical records as Dr. Spencer Doblin Kim.

58.     At approximately 3:30 a.m., Plaintiff was transported back to the 60th Precinct, where she remained in custody until 10:00 a.m. She was then transferred to Brooklyn Central Booking.

59.     Upon arrival at Central Booking, the officer transferring custody asked Plaintiff if she required hospital treatment. She responded that she had already been hospitalized. The officer reviewed her arrest paperwork and discovered it incorrectly stated that she had requested hospital transport, with no documentation reflecting that treatment had occurred. The Correction Officer (CO) then asked how she was injured, and Plaintiff explained that she had been assaulted during the arrest. Recognizing the discrepancy, the CO directed the NYPD officer to correct the paperwork before she could be processed.

60.     Plaintiff remained in Central Booking until approximately 9:00 p.m. on June 12, 2024. She eventually met with an attorney who informed her that she would not be prosecuted.

61.     When Plaintiff was brought before the arraignment judge, her lawyer was not present. The judge inquired about the charges, and the Assistant District Attorney responded vaguely: "Something about numbers." The judge then issued an adjournment in contemplation of dismissal (ACD) and instructed Plaintiff not to get into trouble for six months. No formal charges were ever pursued.

62.     Following the arrest, Defendant CORDERO failed to provide a property voucher. He had seized Plaintiff's e-bike, money, jewelry, phone, ID, and house keys.

63.     On July 1, 2024, Plaintiff visited the District Attorney's Office, where she was issued a property release form. When she brought the form to the 60th Precinct, two officers at the front desk told her the document was "meaningless" and refused to return her property. They falsely claimed that she needed a license, registration, and insurance to retrieve her e-bike. Plaintiff explained that her e-bike did not require such documents and that she had a valid DA-issued release. Nonetheless, the officers threatened her with arrest if she did not leave immediately.

64.     Only later did Plaintiff learn, through her electronic medical records, the name of the hospital to which she had been taken and the identity of the treating physician—facts that had been concealed from her during and after treatment.

65.     As a result of this traumatic, unlawful, and racially charged arrest, Plaintiff has suffered persistent physical injuries, including radiating back pain, numbness in her right foot, and tingling in her hands, arms, and fingers. Her right shoulder, previously repaired in a 2017 rotator cuff surgery, was reinjured during the violent restraint and remains under medical evaluation. She is currently undergoing physical therapy and awaiting an MRI to assess the full extent of her injuries.

66.     In addition to her physical trauma, Plaintiff continues to experience profound emotional distress, humiliation, and psychological trauma, all stemming from this egregious violation of her civil rights and the racially abusive conduct of NYPD personnel. What began as a routine attempt to purchase cotton candy for her five-year-old daughter devolved into a nightmare of unconstitutional policing.

## OFFICER PROFILES

### Summary of Lieutenant Special Assignment Daniel Lacalamita's History of Misconduct and Supervisory Failure

67.     Defendant DANIEL LACALAMITA is currently assigned to the 60th Precinct, where he has served since October 2023. Before this assignment, he was stationed at the 61st Precinct, Police Service Area 3, the 83rd Precinct, and the 123rd Precinct. His service with the NYPD began in July 2004, and he earned an annual salary of $303,000 in the last fiscal year. Over his career, he has amassed a total of 12 complaints and 22 allegations, including accusations of excessive force, failure to provide medical attention and unlawful searches. Despite this history, none of the allegations have been substantiated due to the complainant's unavailability or internal exoneration. Lacalamita was named in the lawsuit Abreu, Ramon vs. City of New York, et al. (2018), which resulted in a $15,000 settlement. His record reflects repeated incidents of alleged misconduct, yet he has remained in positions of authority within the department.

### Summary of Sergeant Stanislav Zubyk's History of Misconduct and Supervisory Failure

68.     Defendant STANISLAV ZUBYK has been assigned to the 60th Precinct since September 2023. Previously, he served at the Intelligence Operations and Analysis Section, Patrol Borough Staten Island, and the 120th Precinct. He has been with the NYPD since July 2014 and had an annual salary of $214,000 in the last fiscal year. Zubyk has faced prior

excessive force complaints, including a 2015 complaint filed by a 33-year-old woman alleging excessive force. The department later exonerated the allegation. He was also named in the lawsuit Graham, Jessica C. vs. Matteo, Valeri, et al. (2014), which involved allegations of police misconduct. Despite the accusations against him, Zubyk has remained in a supervisory position within the NYPD.

**Summary of Police Officer Michael R. Moran's History of Misconduct**

69.    Defendant MICHAEL R. MORAN has been assigned to the 60th Precinct since May 2021. He began his NYPD service in November 2020 and had an annual salary of $100,000 in the last fiscal year. Moran has been the subject of nine complaints involving 27 allegations, including excessive force, discourtesy, and illegal searches. One complaint was substantiated for discourtesy, resulting in a minor disciplinary action. Moran is currently facing multiple ongoing litigations related to excessive force and police misconduct. Despite the volume of complaints against him, he continues to serve without significant disciplinary repercussions.

**Summary of Police Officer Alvin M. Nieves's History of Misconduct**

70.    Defendant ALVIN M. NIEVES has been stationed at the 60th Precinct since January 2023. His NYPD service began in July 2022, and he had an annual salary of $83,300 in the last fiscal year. Nieves has been the subject of a complaint involving three allegations, including excessive force, illegal stops, and unlawful searches. All three allegations were deemed "within NYPD guidelines," allowing him to avoid formal discipline. Despite the troubling nature of these allegations, Nieves continues to work in active policing roles without oversight or consequences.

**Summary of Jared W. Cordero's History of Misconduct**

71.    Defendant JARED W. CORDERO has been assigned to the 60th Precinct since September 2024. He began his NYPD service in April 2022 and had an annual salary of $90,000 in the last fiscal year. Cordero has been the subject of one complaint involving four allegations, including racial slurs, unlawful stops, property seizure, and verbal abuse. All complaints were marked as "Complainant Unavailable," preventing further investigation or disciplinary action. Despite these serious allegations, he continues to patrol without accountability.

72.    These officers have a documented history of excessive force, racial profiling, and abuse of authority. Their actions on June 11, 2024, resulted in the unlawful arrest, excessive use of force, racial abuse, and mistreatment of Plaintiff. Their misconduct is consistent with the broader pattern of unconstitutional policing practices within the NYPD. The lack of discipline and oversight underscores the failure of the City of New York to supervise, train, and regulate its police force, supporting the Monell liability claims set forth in this federal complaint.

## NYPD STATISTICAL DATA

To assess potential disparities in NYPD vehicle stops during the fourth quarter of 2024, we can compare the racial distribution of these stops to New York City's overall demographic composition.

**Racial Composition of NYPD Vehicle Stops (Q4 2024):**

- Black: 29.8%
- Hispanic: 29%
- White: 17.8%
- Asian/Pacific Islander: 12.3%
- Other/Unknown: 11.1%

**New York City Demographics:**

- White: 35.9%
- Black: 22.7%
- Hispanic or Latino: 28.4%
- Asian: 14.6%

*Source: U.S. Census Bureau QuickFacts for New York City*

24

**Analysis:**

- **Black Residents:** Although comprising 22.7% of the city's population, Black individuals accounted for 29.8% of vehicle stops, indicating a potential overrepresentation.
- **Hispanic Residents:** Hispanic or Latino individuals comprise 28.4% of the population and represent 29% of vehicle stops, suggesting a proportionate representation.
- **White Residents:** Although white individuals constitute 35.9% of the population, they accounted for only 17.8% of vehicle stops, indicating a potential underrepresentation.
- **Asian Residents:** Asians represent 14.6% of the population and 12.3% of vehicle stops, suggesting a slight underrepresentation.

73.    The data suggests that Black residents are stopped at a higher rate relative to their share of the population, while White residents are stopped at a lower rate. These disparities may indicate potential biases in traffic enforcement practices. Further analysis, considering factors such as driving patterns and law enforcement deployment, would be necessary to draw definitive conclusions.

## FINDINGS FROM THE FLOYD MONITOR'S 23RD REPORT

The Floyd Monitor's 23rd Report, which assesses NYPD's compliance with court-ordered reforms following the landmark Floyd v. City of New York case, provides compelling evidence of systemic constitutional violations by the NYPD. The report's findings further substantiate the legal claims asserted in this matter, particularly regarding racial profiling, unconstitutional stops, and failures in NYPD supervision.

**A. Widespread Unconstitutional Stops and Searches**
- The report found that only 75% of Neighborhood Safety Teams (NSTs) stops were lawful, compared to 92% of regular patrol officers.
- Only 58% of frisks and 54% of searches conducted by NST officers were lawful, meaning that nearly half of all frisks and searches lacked legal justification.
- NST officers disproportionately targeted Black and Latino individuals while engaging in self-initiated stops without reasonable suspicion.

**B. Systemic Racial Disparities in Enforcement**
- 95% of stop reports and 93% of body-worn camera (BWC) footage involved Black or Hispanic individuals, reinforcing a pattern of racial profiling.
- Despite these apparent racial disparities, NYPD supervisors failed to address or rectify the department's unconstitutional practices.
- Supervisors approved 99.1% of stop reports as "lawful," even when independent audits found many unconstitutional.

### C. Supervisory Failures and Institutional Negligence

- Supervisors routinely failed to identify racial profiling or unconstitutional stops.
- NYPD officers engaged in unlawful self-initiated stops 70% of the time, indicating a lack of proper oversight.
- The report found that NYPD leadership had systemically ignored evidence of unconstitutional conduct, permitting ongoing civil rights violations.

74.     The findings from the Floyd Monitor's 23rd Report, in conjunction with statistical analysis of NYPD vehicle stops, provide compelling evidence of systemic racial profiling, unconstitutional stops, and supervisory failures within the NYPD. This evidence directly supports the legal claims asserted in this case, reinforcing constitutional violations and the City of New York's liability under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments, Monell liability doctrine, and the NYC Human Rights Law (Administrative Code § 8-107).

75.     The Floyd Monitor's findings confirm that NYPD officers routinely conduct stops without reasonable suspicion, disproportionately targeting Black and Latino individuals, which constitutes a clear violation of the Fourth Amendment's protections against unlawful searches and seizures.

76.     The systemic racial disparities in NYPD traffic stops are not coincidental but reflective of a pattern of unconstitutional and discriminatory policing practices, violating the Equal Protection Clause of the Fourteenth Amendment.

77.     The events described above occurred in a broader context of racially discriminatory and unconstitutional policing by the NYPD, as evidenced by numerous prior civil rights cases involving similarly situated victims, including Eric Garner, Delrawn Small, Kawaski Trawick, Dounya Zayer, and Jaylin Ryan.

78.     The failure of NYPD supervisors and leadership to correct or address these unconstitutional practices demonstrates a deliberate indifference to civil rights violations, meeting the legal standard for municipal liability under Monell v. Department of Social Services.

26

79.     The NYPD's documented failure to intervene, correct, or discipline officers engaging in racial profiling further substantiates violations of New York City Human Rights Law (Administrative Code § 8-107), which prohibits discriminatory policing.

## VIOLATIONS AND CLAIMS ALLEGED

**COUNT I**
**VIOLATION OF THE FOURTH AMENDMENT –**
**UNLAWFUL SEARCH AND SEIZURE**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5**

80.     Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

81.     The FOURTH AMENDMENT to the UNITED STATES CONSTITUTION, as incorporated against state actors through the FOURTEENTH AMENDMENT, protects individuals from unreasonable searches and seizures by law enforcement officials.

82.     On June 11, 2024, Plaintiff KEYANNA MOODY was lawfully operating a Z6 Fly e-bike in Coney Island, New York, which under applicable state and local law does not require a license, registration, or insurance. While stationary at the corner of Surf Avenue and West 15th Street, Plaintiff was suddenly and aggressively approached by officers of the New York City Police Department, including Defendants ALVIN M. NIEVES and JARED W. CORDERO, who initiated a stop without any probable cause or reasonable suspicion.

83.     Without legal justification, Defendant NIEVES immediately seized Plaintiff's e-bike keys and demanded documentation that she was not required to carry. Plaintiff complied with officer commands and calmly explained her legal position. Nonetheless, Defendant DANIEL LACALAMITA, acting as the highest-ranking officer on the scene, ordered her arrest.

84.    Defendants MICHAEL R. MORAN and JARED W. CORDERO then violently tackled Plaintiff to the ground, while Defendant NIEVES attempted multiple times to deploy a taser against her. After the taser failed, Defendant NIEVES joined in physically restraining Plaintiff. While she lay prone and handcuffed on the pavement, Defendant MORAN stepped on her back and legs.

85.    As this occurred, Defendant STANISLAV ZUBYK, a supervising sergeant on scene, stood by without taking action to stop or prevent the unlawful and excessive use of force, despite having the authority and opportunity to do so. Defendant ZUBYK'S failure to intervene constitutes deliberate indifference to Plaintiff's clearly established constitutional rights.

86.    Plaintiff was then forcibly dragged and thrown face-first into the backseat of a police vehicle while handcuffed, in violation of NYPD policy prohibiting prolonged prone positioning due to the risk of positional asphyxia. Her foot became trapped in the door, and her screams of pain were ignored by all Defendants present.

87.    Defendant LACALAMITA further escalated the abuse by directing officers to "put that bitch in a cage" and by verbally and physically assaulting Plaintiff during her transport and precinct intake.

88.    At no point did any of the Defendants, including JOHN DOES 1–5, attempt to intervene, stop the seizure, de-escalate the encounter, or protect Plaintiff from unlawful harm. These officers either participated directly or remained complicit by standing silent.

89.    The stop, detention, search, and arrest were conducted without any lawful basis, were excessive in scope and manner, and were motivated in part by racial animus and abuse of authority. No probable cause or reasonable suspicion ever existed to justify the seizure of Plaintiff or her property.

90.     The seizure of Plaintiff's person constituted a false arrest in violation of the

Fourth Amendment, as it was made without a warrant, without probable cause, and absent any

legal justification.

91.     The actions and omissions of Defendants LACALAMITA, ZUBYK, MORAN,

NIEVES, CORDERO, and JOHN DOES 1–5 were carried out intentionally, recklessly, and

under color of state law, and violated clearly established rights under the FOURTH and

FOURTEENTH AMENDMENTS.

92.     As a direct and proximate result of Defendants conduct, Plaintiff suffered

unlawful detention, physical injury, emotional distress, psychological trauma, and other

compensable harms.

93.     Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL

LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED

W. CORDERO, and JOHN DOES 1–5 for compensatory damages, punitive damages, attorneys'

fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems

just and proper.

**COUNT II**
**VIOLATION OF THE FOURTH AMENDMENT –**
**EXCESSIVE FORCE**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL**
**R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5**

94.     Plaintiff KEYANNA MOODY repeats and realleges each and every preceding

paragraph as if fully set forth herein.

95.     The FOURTH AMENDMENT to the UNITED STATES CONSTITUTION, as

incorporated against the states through the FOURTEENTH AMENDMENT, prohibits the use of

excessive and unreasonable force by law enforcement officers in the course of an arrest, investigatory stop, or other seizure.

96.     On June 11, 2024, Plaintiff KEYANNA MOODY was violently tackled to the ground by Defendants MICHAEL R. MORAN and JARED W. CORDERO, despite posing no threat and fully complying with commands. Defendant ALVIN M. NIEVES attempted to deploy his taser against Plaintiff multiple times before joining the others in physically restraining her.

97.     While Plaintiff lay handcuffed and prone on the pavement, Defendant NIEVES forcefully drove his knee and hands into her back, and Defendant MORAN stepped on her back and legs, treating her body as a stepping mat. Plaintiff cried out in pain, but the excessive force continued.

98.     After being dragged to a patrol car, Defendants threw Plaintiff face-first into the backseat, causing her foot to become caught in the door. Her screams were ignored for several moments before officers released her trapped foot. Defendant DANIEL LACALAMITA then ordered subordinates to "put that bitch in a cage," and Plaintiff was transferred to another police vehicle equipped with a prisoner partition.

99.     At the 60th Precinct, while still handcuffed, Plaintiff was approached by Defendant LACALAMITA, who without warning kicked her to the floor and yelled, "get the fuck up," as she lay in pain. This further assault occurred in the presence of other Defendants, including supervisory officer Defendant STANISLAV ZUBYK, who took no action to stop or report the conduct.

100.    The force used against Plaintiff was excessive, objectively unreasonable under the circumstances, and was applied without lawful justification, necessity, or proportionality. At no point did Plaintiff threaten officers, resist arrest, or pose any danger to their safety.

101.    Defendants JOHN DOES 1–5, who were present on the scene and at the precinct, failed to intervene to stop the known and ongoing use of excessive force, despite having the opportunity and legal obligation to do so.

102.    The acts and omissions of Defendants LACALAMITA, ZUBYK, MORAN, NIEVES, CORDERO, and JOHN DOES 1–5 were carried out intentionally, maliciously, and under color of state law within the scope of their employment with the New York City Police Department.

103.    As a direct and proximate result of the use of excessive force, Plaintiff suffered severe physical injuries, including back pain, radiating leg pain, numbness in her extremities, reinjury to a previously operated shoulder, as well as emotional distress, humiliation, and psychological trauma.

104.    Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

**COUNT III**
**VIOLATION OF THE FIRST AMENDMENT –**
**RETALIATION FOR PROTECTED ACTIVITY**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5**

105.    Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

106.    The FIRST AMENDMENT to the UNITED STATES CONSTITUTION protects the right of individuals to speak freely and to object to or criticize government actions, including the conduct of law enforcement officers in public spaces.

107.    On June 11, 2024, Plaintiff KEYANNA MOODY verbally asserted her legal right not to provide documentation for her e-bike, calmly stating that she was not required to possess a license, registration, or insurance to operate her e-bike under New York law.

108.    This statement was protected speech under the FIRST AMENDMENT and was delivered peacefully, without threat, obstruction, or interference with police activity.

109.    In direct response to Plaintiff's exercise of her constitutionally protected speech, Defendant DANIEL LACALAMITA escalated the encounter and ordered her arrest, despite lacking probable cause or any articulable legal justification. The arrest was substantially motivated by Plaintiff's verbal assertion of her rights and was intended to chill or punish her protected expression.

110.    Defendants STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 failed to intervene or prevent this retaliatory escalation, despite being present and aware of the sequence of events.

111.    The arrest and excessive force inflicted on Plaintiff were undertaken to punish and silence her for asserting her legal rights, and were not justified by any legitimate law enforcement interest.

112.    As a direct and proximate result of this retaliation, Plaintiff suffered a violation of her constitutional rights, along with physical injury, emotional distress, intimidation, and psychological trauma.

113.    Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

### COUNT IV
### VIOLATION OF THE FOURTEENTH AMENDMENT – DENIAL OF MEDICAL CARE – 60TH PRECINCT
### (42 U.S.C. § 1983)
### AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5

114.    Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

115.    The FOURTEENTH AMENDMENT to the UNITED STATES CONSTITUTION, as applied to individuals in pretrial detention, guarantees the right to adequate medical care while in the custody of law enforcement officials.

116.    On June 11, 2024, following her violent assault by NYPD officers, Plaintiff KEYANNA MOODY sustained visible and serious injuries, including bleeding knees, back pain, radiating leg pain, numbness in her extremities, and reinjury to a surgically repaired shoulder—injuries that were immediately apparent to all Defendants present at the scene and in the precinct.

117.    Despite these obvious injuries, Plaintiff was denied medical treatment for over five hours while held at the 60th Precinct. She made repeated requests for medical assistance, all of which were intentionally ignored by Defendants ALVIN M. NIEVES and JARED W. CORDERO, who had direct custody of Plaintiff and observed her condition.

118.    Defendant DANIEL LACALAMITA, the senior officer present and acting supervisor, was fully aware of Plaintiff's injuries and her ongoing requests for care. Rather than

33

ensure medical intervention, he escalated her trauma by kicking her to the floor while handcuffed and yelling for her to "get the fuck up."

119.    Defendant STANISLAV ZUBYK, a sergeant and supervisory officer also present at the precinct, knowingly failed to ensure that Plaintiff received necessary medical care. Despite observing her visible injuries and hearing her repeated pleas for help, Defendant ZUBYK took no steps to secure medical attention, document her injuries, or intervene in the misconduct of his subordinates.

120.    The unidentified DESK OFFICER at the 60th Precinct, who was present during intake and processing, likewise failed to respond to Plaintiff's injuries and request for treatment, despite having both authority and opportunity to do so.

121.    Plaintiff was ultimately transported to South Shore Brooklyn Hospital only after refusing to provide her fingerprints, at which point EMS personnel determined she required emergency care.

122.    The delay in treatment was not the result of neglect or administrative error—it was deliberate, punitive, and carried out with subjective awareness of the risk of further injury, in violation of Plaintiff's clearly established rights under the FOURTEENTH AMENDMENT.

123.    The conduct of Defendants' LACALAMITA, ZUBYK, NIEVES, CORDERO, JOHN DOES 1–5, was objectively unreasonable and demonstrated deliberate indifference to Plaintiff's serious medical needs, actionable under 42 U.S.C. § 1983.

124.    As a direct and proximate result of the denial of medical care, Plaintiff suffered prolonged physical pain, psychological trauma, worsening of her injuries, reinjury to her shoulder, and ongoing treatment including physical therapy and diagnostic imaging.

125.     Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL

LACALAMITA, STANISLAV ZUBYK, ALVIN M. NIEVES, JARED W. CORDERO, JOHN

DOES 1–5, for compensatory damages, punitive damages, attorneys' fees and costs pursuant to

42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

**COUNT V**
**VIOLATION OF THE FOURTEENTH AMENDMENT –**
**EQUAL PROTECTION: RACIAL PROFILING AND SUPERVISORY RATIFICATION**
**(42 U.S.C. § 1983 Arlington Heights Theory)**
**AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL**
**R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5**

126.     Plaintiff KEYANNA MOODY repeats and realleges each and every preceding

paragraph as if fully set forth herein.

127.     The EQUAL PROTECTION CLAUSE of the FOURTEENTH AMENDMENT

prohibits law enforcement officers and government officials from engaging in or ratifying

racially discriminatory policing, including selective enforcement and targeting based on race or

ethnicity.

128.     On June 11, 2024, Plaintiff KEYANNA MOODY—a Black woman—was

lawfully operating a Z6 Fly e-bike that did not require registration, license, or insurance. While

stopped peacefully with her husband in Coney Island, she was aggressively confronted by

Defendants ALVIN M. NIEVES and JARED W. CORDERO, who initiated a stop without legal

justification and demanded documentation not required by law.

129.     Although Plaintiff complied and calmly explained her legal position, Defendant

DANIEL LACALAMITA escalated the encounter by ordering her arrest, calling her a "Black

bitch," and authorizing the use of force without cause. Defendants MICHAEL R. MORAN and

CORDERO tackled her to the ground, while Defendant NIEVES attempted to tase her and

pressed his knee and hands into her back.

130.    Defendant STANISLAV ZUBYK, a sergeant and supervisor, witnessed these events and failed to intervene or report the racially motivated misconduct, despite having the legal duty and authority to do so.

131.    The conduct of the individual Defendants was motivated, at least in part, by Plaintiff's race, and was inconsistent with how similarly situated white individuals operating e-bikes are treated under NYPD policy and practice.

132.    Defendant STANISLAV ZUBYK, a supervisory officer, and Defendant DANIEL LACALAMITA, in his dual role as both direct participant and supervisor, had the authority, legal obligation, and opportunity to correct the constitutional violations but acted with deliberate indifference, thereby ratifying the racially discriminatory conduct of their subordinates..

133.    The NYPD's racial profiling of Plaintiff is consistent with broader patterns documented in oversight reports, including the Floyd Monitor's 23rd Report and Q4 2024 NYPD stop data, which show persistent racial disparities in enforcement and a failure of supervisory accountability.

134.    Direct and circumstantial evidence—including the absence of probable cause, use of racial slurs, statistical disparities, officer misconduct history, and high-level inaction—support an inference of discriminatory intent under the framework articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

135.    As a direct and proximate result of the racially discriminatory actions and omissions of the Defendants, Plaintiff suffered a violation of her constitutional rights under the EQUAL PROTECTION CLAUSE, as well as physical injuries, emotional distress, reputational harm, and other compensable damages.

136.    Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 for compensatory damages, punitive damages, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

**COUNT VI**
**FAILURE TO INTERVENE IN VIOLATION OF THE FOURTH**
**AND FOURTEENTH AMENDMENTS**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL**
**R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5**

137.    Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

138.    Law enforcement officers and supervisory officials have a clearly established constitutional duty under the FOURTH and FOURTEENTH AMENDMENTS to intervene when they observe or are informed of another officer engaging in excessive force, unlawful seizure, racially discriminatory conduct, or denial of medical care—especially where they have the authority to prevent or mitigate such violations.

139.    On June 11, 2024, Plaintiff was unlawfully stopped, physically assaulted, and falsely arrested by Defendants NIEVES, CORDERO, and MORAN. Defendant LACALAMITA, the highest-ranking officer at the scene, personally escalated the encounter by ordering the arrest without probable cause, calling Plaintiff a "Black bitch," grabbing her by the head and neck, and violently pulling her toward a patrol car. He ordered that she be "put in a cage" and directed her prone placement in the backseat of the vehicle in violation of NYPD policy. Despite witnessing this abuse, Defendant ZUBYK, a supervisory officer, failed to intervene.

140.    Plaintiff was tackled to the ground without cause, subjected to attempted taser deployment, and physically restrained in a manner inconsistent with department policy. While she lay on the pavement, Defendant NIEVES drove his knee into her back and Defendant MORAN stepped on her legs. Plaintiff screamed in pain as her foot was trapped in the police vehicle door, but none of the Defendants present—including supervisory officers—acted to de-escalate or stop the ongoing abuse.

141.    Plaintiff was then transported to the 60th Precinct, where the abuse continued. Defendant LACALAMITA kicked her while she was handcuffed on the floor and yelled for her to "get the fuck up." Despite being in the presence of multiple officers—including Defendants ZUBYK, MORAN, CORDERO, NIEVES, JOHN DOES 1–5, and the DESK OFFICER—no one intervened or reported the conduct. During intake, Plaintiff was subjected to a full-body search by male officers despite the presence of a female officer. Her requests for medical attention were ignored for hours.

142.    Even after Plaintiff was transported to the hospital due to her visible injuries, none of the involved officers took action to rectify the abuse, report the racial misconduct, or initiate medical care procedures upon her return. Their failure to intervene in the face of clear constitutional violations—including racially charged language, unauthorized force, and denial of care—demonstrates a culture of indifference and complicity.

143.    The repeated failure of these Defendants to intervene allowed the constitutional violations to continue and escalate—resulting in prolonged pain, psychological trauma, the reinjury of a previously surgically repaired shoulder, and extended deprivation of liberty.

144.    These failures were not isolated omissions—they reflected deliberate indifference and tacit approval of unlawful conduct by both direct participants and those in supervisory positions with the authority to stop the abuse.

145.    As a direct and proximate result of the failure to intervene by Defendants LACALAMITA, ZUBYK, MORAN, NIEVES, CORDERO, JOHN DOES 1–5, and the DESK OFFICER at the 60th Precinct, Plaintiff suffered physical injuries, emotional distress, constitutional deprivations, and other compensable harm.

146.    Plaintiff KEYANNA MOODY seeks judgment against Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, JOHN DOES 1–5, for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

## COUNT VII
## MUNICIPAL LIABILITY – FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE
### (42 U.S.C. § 1983 – MONELL CLAIM)
### AGAINST DEFENDANT THE CITY OF NEW YORK

147.    Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

148.    Defendant THE CITY OF NEW YORK is liable for the violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments pursuant to the doctrine established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

149.    The constitutional violations committed against Plaintiff were directly and proximately caused by the policies, customs, practices, and usages of THE CITY OF NEW YORK and the New York City Police Department, including the failure to adequately train, supervise, investigate, and discipline officers known to engage in unlawful conduct.

150.    At all relevant times, NYPD personnel acted in accordance with a widespread custom, pattern, and practice of racially biased and unconstitutional policing. These practices include, but are not limited to: Conducting stops of Black individuals without probable cause or reasonable suspicion; Using excessive force during arrest and transport, including the prone positioning of arrestees in violation of NYPD policy; Engaging in verbal abuse and racial slurs during police-civilian encounters; Failing to summon or provide prompt medical care to injured detainees; Conducting unlawful searches by male officers, even in the presence of female officers; Retaliating against civilians for asserting their legal rights; and Failing to intervene in clear and ongoing constitutional violations committed in the presence of supervisory personnel.

151.    The individual officers involved in the June 11, 2024 incident—Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5—acted in conformity with the NYPD's de facto policies and were emboldened by the City's systemic failure to enforce constitutional compliance through adequate training, supervision, or accountability measures.

152.    These failures occurred despite the City's long-standing and well-documented knowledge—through internal disciplinary records, Civilian Complaint Review Board findings, civil litigation, and public oversight reports—that NYPD officers regularly engage in racially discriminatory and excessive policing practices, particularly against Black New Yorkers in high-enforcement areas such as Coney Island.

153.    The Floyd Monitor's 23rd Report and NYPD Q4 2024 vehicle stop data confirm the existence of persistent racial disparities, widespread failure to document or report force, and routine supervisory approval of unconstitutional conduct—all of which reflect deliberate indifference on the part of THE CITY OF NEW YORK.

154.    These policies and practices were a moving force behind the violations of Plaintiff's constitutional rights, including her unlawful stop, excessive force, retaliatory arrest, denial of medical care, and prolonged detention. The CITY's failure to act constitutes deliberate indifference to the rights of Black residents and e-bike operators, and directly contributed to the abuse Plaintiff suffered.

155.    As a direct and proximate result of THE CITY OF NEW YORK's policies, customs, and failures, Plaintiff sustained violations of her constitutional rights under the Fourth and Fourteenth Amendments, as well as physical pain, emotional distress, psychological trauma, and reputational harm.

156.    Plaintiff KEYANNA MOODY seeks judgment against Defendant THE CITY OF NEW YORK for compensatory damages, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper.

**COUNT VIII**
**DISCRIMINATORY POLICING – RACIAL PROFILING**
**(N.Y.C. ADMINISTRATIVE CODE § 8-107(17))**
**AGAINST DEFENDANTS THE CITY OF NEW YORK, DANIEL LACALAMITA,**
**STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W.**
**CORDERO, and JOHN DOES 1–5**

157.    Plaintiff KEYANNA MOODY repeats and realleges each and every preceding paragraph as if fully set forth herein.

158.    New York City Administrative Code § 8-107(17)(a)(1) prohibits law enforcement officers and agencies from engaging in bias-based profiling or selective enforcement based on race, color, ethnicity, or national origin. Section 8-107(6) further prohibits aiding, abetting, inciting, compelling, or coercing such discrimination, or failing to take remedial action.

159.    On June 11, 2024, Plaintiff—a Black woman—was lawfully operating a Z6 Fly e-bike near Surf Avenue and West 15th Street in Coney Island when she was aggressively

confronted by NYPD officers operating an unmarked vehicle and a police scooter. The officers, including Defendants ALVIN M. NIEVES and JARED W. CORDERO, initiated a stop without probable cause or reasonable suspicion and demanded license, registration, and insurance documentation for her e-bike—none of which are legally required under New York law.

160.    Despite Plaintiff's peaceful compliance and explanation of her legal rights, Defendant DANIEL LACALAMITA ordered her arrest, called her a "Black bitch," and participated in a brutal and degrading use of force. Plaintiff was tackled, subjected to attempted taser deployment, pinned to the ground, and transported while prone in violation of NYPD policy.

161.    Defendant STANISLAV ZUBYK, a supervisory sergeant, personally observed these events and took no steps to intervene or stop the racially abusive conduct, despite having a legal duty to do so. Other Defendants—including JOHN DOES 1–5—were also present during the use of force and racially charged verbal abuse and failed to act.

162.    Plaintiff was later assaulted at the 60th Precinct, denied medical care for over five hours, and subjected to an unlawful full-body search by male officers. These actions, taken collectively, reflect a broader pattern of racially discriminatory enforcement against Black individuals—particularly Black women—operating personal mobility devices.

163.    The conduct of the individual Defendants was motivated, at least in part, by Plaintiff's race, and was inconsistent with NYPD treatment of similarly situated white individuals operating unregistered e-bikes or similar vehicles.

164.    These violations are consistent with broader patterns of racially discriminatory policing documented in public reports. According to NYPD Q4 2024 stop data, Black residents—only 22.7% of the city's population—accounted for 29.8% of all NYPD vehicle

stops. White residents, who comprise over one-third of the population, accounted for only 17.8% of stops. The Floyd Monitor's 23rd Report further found that over 90% of NYPD street stops targeted Black or Latino individuals, with Neighborhood Safety Teams routinely engaging in unconstitutional enforcement and supervisors failing to correct misconduct.

165.    The racial profiling and selective enforcement that Plaintiff experienced was not an isolated incident but rather the product of a systemic failure by Defendant THE CITY OF NEW YORK to properly train, supervise, and discipline officers engaged in racially biased policing.

166.    Under the NYCHRL, Plaintiff need not prove but-for causation or compare herself to a similarly situated white individual. It is sufficient that race was a motivating factor in the challenged conduct. See *Williams v. New York City Housing Auth.*, 61 A.D.3d 62, 77–78 (1st Dep't 2009).

167.    As a direct and proximate result of the racially discriminatory conduct of the Defendants, Plaintiff suffered emotional distress, humiliation, reputational harm, denial of medical care, and physical and psychological injuries compensable under § 8-502(a) of the NYCHRL.

168.    Plaintiff KEYANNA MOODY seeks judgment against Defendants THE CITY OF NEW YORK, DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 for: Compensatory damages; Punitive damages (as permitted by § 8-502(a)); Declaratory and equitable relief; Reasonable attorneys' fees and costs pursuant to § 8-502(f); and such other and further relief as this Court deems just and proper.

## **<u>JURY TRIAL</u>**

169.    Plaintiff KEYANNA MOODY demand a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KEYANNA MOODY respectfully requests that this Court enter judgment in her favor and against the Defendants, and award the following relief::

A.  On all federal claims brought pursuant to 42 U.S.C. § 1983—including violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution—an award of compensatory damages against Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5, and THE CITY OF NEW YORK in an amount to be determined at trial;

B.  An award of punitive damages against the individual Defendants DANIEL LACALAMITA, STANISLAV ZUBYK, MICHAEL R. MORAN, ALVIN M. NIEVES, JARED W. CORDERO, and JOHN DOES 1–5 —in an amount sufficient to punish and deter future constitutional violations;

C.  On the municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a finding of liability against Defendant THE CITY OF NEW YORK for maintaining unconstitutional customs, practices, and policies that were the moving force behind the violations of Plaintiffs' rights;

D.  On the local law claims under the New York City Human Rights Law (Administrative Code § 8-107(17)), an award of compensatory and punitive damages (where authorized) against all applicable Defendants for engaging in or ratifying discriminatory profiling and selective enforcement based on race;

E.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and N.Y.C. Admin. Code § 8-502(f);

F.  A declaratory judgment that the conduct of the Defendants violated Plaintiffs clearly established constitutional and statutory rights under federal and New York City law;

G.  Prejudgment and post-judgment interest to the fullest extent permitted by law; and

H.  Such other and further relief as this Court deems just and proper.

Dated:  April 17, 2025
        New York, NY

                       Respectfully submitted,

                       By:    _____s/Eric Sanders_____
                             Eric Sanders

                       Eric Sanders, Esq.
                       **THE SANDERS FIRM, P.C.**
                       30 Wall Street, 8th Floor
                       New York, NY 10005
                       (212) 652-2782 (Business Telephone)
                       (212) 652-2783 (Facsimile)

                       Website: http://www.thesandersfirmpc.com